Good morning, Your Honors. My name is Eric Wilson. I'm with the law firm of Latke & Latke, here today representing the plaintiffs in this matter. I'm going to focus my comments today on our first and fourth assignment of errors in this matter. The first assignment of error is that the District Court improperly granted summary judgment on plaintiffs' sexual harassment claims under Title VII and ORS 659A-030. Help me on something with Mott. I guess what bothers me here is I have trouble seeing a genuine issue of fact on whether her hours were reduced because she complained, because it looks like she didn't actually complain, and the reduction in hours was a company-wide policy of reducing hours, and they reduced men's hours, not just her hours or women's hours or anything like that. And also, the sexual harasser, Klett, was transferred away from her and then fired. I don't get it. As far as her being constructively discharged, it looks like she just abandoned the job. I just don't get where the evidence is on the elements that would create a genuine issue. Yes, Your Honor. Our prima facie burden requires us to prove that there was unwanted sexual comments and that those comments were severe and pervasive enough to alter the working conditions for these plaintiffs. If we can prove those elements to be true. We're talking about Mott now. Separate them. Yes, Your Honor. I'm talking about Mott now. So if we can prove those three elements from Mott. What are the three elements? The three elements are that there was verbal or physical conduct of a sexual nature, that the conduct was unwanted, and that the conduct was severe or pervasive enough to alter the working conditions and create a hostile or abusive working environment. So we don't need to show any tangible employment actions there to meet our burden. It doesn't matter what they did in terms of discharging anyone or transferring him out. But you'd have to overcome their Farragher-Ellis defense. That's correct, Your Honor. Once we prove our three elements, then defendants are entitled to a Farragher-Ellis defense where they must prove three elements to substantiate their defense. And those three elements are that they took reasonable care to prevent and correct any sexually harassing behavior, that the plaintiffs unreasonably failed to take advantage of preventative opportunities, and that the harassment did not culminate in a tangible employment action. The burden is on them for those three elements. So as to Mott, we believe we can show that she satisfies the first three elements of her prima facie burden. And the only one that's in dispute is the third element. Let's assume that. I realize the assumption is debatable, but let's assume it for purposes of discussion. Yes, Your Honor. I don't understand why the affirmative defense, why there's a genuine issue on whether the affirmative defense protects them from liability, that they exercise reasonable care to prevent and correct promptly the harassing behavior, and that Mott unreasonably failed to take advantage of the preventative or corrective opportunities provided. Yes, Your Honor. And those are the issues I want to focus my comments on here today. And it's important that those are three elements. It's not disjunctive. They need to prove all three of those in order to substantiate their burden. And that's at 534 U.S. 775. It's two elements, I think. But there's your genuine issue on them. They're also not entitled to the defense if there was a tangible employment action. So they're not entitled to that with a tangible employment action. I believe the second, in terms of unreasonably failing to take advantage of the preventative opportunities, is a closer call. But as to the first element, no reasonable juror could look at these facts and conclude that Office Depot took reasonable care to prevent and correct any sexually harassing behavior. And the reasons for that is because the evidence in the record shows that not only did Office Depot not prevent sexual harassment here, but that they fostered the sexual harassment that occurred and forced two plaintiffs to resign their employment in this matter. And we know that because the sexual harasser, the wrong juror in this matter, was deposed. Mr. Kleisch, during his deposition, he testified that he received no formal sexual harassment training during his three and a half months of management training with Office Depot. Once there was a complaint, and the complaint wasn't even from your client, there was complaints from other parties, they immediately investigated, suspended him, even though he was transferred. I was sort of impressed by how quickly they took those steps after they got a complaint from somebody else. Well, Your Honor, the disconnect here is perhaps that there were no fewer than five instances of sexual misconduct by this alleged wrong juror before he began to prey on the two plaintiffs in this case. So are you saying – are you talking about the ones that were four or five years in the past? That's correct, Your Honor, because the standard is that they took reasonable care to prevent and correct any sexually harassing behavior. So if there – if the culture at Office Depot fostered the very sexual harassment that caused this lawsuit to be filed, then they're not entitled to the Ferragore Ellis defense. How do they know until somebody tells them? Well, people did tell them. And he was – this manager was reported for sexual misconduct five separate times before he began to go after the two plaintiffs in this case. Well, I remember that in the five years in the past, there had been incidents, they disciplined him, they counseled him, and then there hadn't been – as I read the record, there hadn't been any incidents, and then they got the third-party complaints from – and they immediately took steps. And let me just walk through the facts, because I think it's important to see them in a stepwise fashion. So testimony from the harasser, no formal sexual harassment training. He also testified that during this training, during his management training, he was subjected to sexual comments by the district manager and by the store manager. And they made all sorts of comments. They're listed on ER 95 and 103, page 14 of our briefs. Made sexually derogatory comments, asking people if they were wearing thongs, talking about who might look good in dress, talking about who looked good that day. And these are the management employees that are training this individual. And Mr. Clash testified that as a result of these comments during his training, he believed that sexual banter at Office Depot was the norm. And that's at ER 104. So instead of training him not to sexually harass people, Office Depot's managers trained him that sexual banter and inappropriate sexual conduct was the norm at Office Depot. That's what he got out of his management training. He's then put in Store 885. Within two months of being put at that store, a co-worker observes him watching pornographic movies on his Office Depot computer. So he's sitting there watching pornographic movies on his office computer. He gets written up for that. He gets a note in his personnel file saying that any further misconduct will result in his termination. And that's at ER 99 and 129. So here's someone who's already been, you know, brought into the culture that sexual banter is okay. Then they're caught viewing pornographic movies at work in view of other workers. He gets a note saying any further misconduct will result in his termination. Well, what happens? Now, two months later, during an interview with a young female applicant, he asks her during the interview, he mentions that he likes blonde hair and mentions that she would probably be wild in bed. And that's at ER 185. And was that brought to the attention of management? It was, Your Honor. This employee reported it. There's a statement in the record at ER 186. This is Cynthia Tardiff where Ms. Tardiff reported that not only were these comments made These are the five years earlier. This is in 2000, but it's important to see how the stepwise approach was not followed here. So after Ms. Tardiff reports this, she also submits a statement saying that after she was hired, the harasser in this case talked to her that he would like to have sex with her in multiple positions, talked about taking her out and bending her over his truck, talked about going out with her after work, followed her after work. As I understood this whole Tardiff thing, this was five years ago. She complained, Office Depot disciplined Klesch and told him any further incidents may result in termination. There were no further incidents for the four or five years before his conduct with Mott and Brackett. And then those incidents were reported, and they did just what they told him they were going to do. That's not true. Tardiff. They fired him. And that's not what the record reflects in this fact, in this case, Your Honor. Well, you've been talking a lot about Tardiff. Well, I just want to, just so her. Sounds like they took care of it. Well, what she reported, as I just said. So at this point, Klesch already has a notice in his personnel file saying any further misconduct will result in termination. So between Tardiff, so after the Tardiff incident, he's disciplined. And then what I saw in the record was nothing happened until, or that was reported to management until these incidents. Now, are you saying something did happen in those four or five years period that was reported to management? I'm saying something did happen in those four or five years that was reported to management, Your Honor. And what was that? So after Home Depot did not terminate him based on the Tardiff complaints, despite the fact that he had a write-up saying he would be terminated for any further misconduct, and despite the fact that the manager who didn't do that was one who had engaged in sexual banter with Mr. Klesch during his training, and that's at ER 104. So what happened? Just tell me, what was the incident? Give me the ER site during that four to five year period. Ms. Workman, who was a manager at Office Depot, heard Mr. Klesch sexually harassing female associates. She testified that she reported that to the store manager, Mr. Berryman. That's at our brief at page 16, and that's ER 125 to 126. She said she reported that to Berryman, the same manager that disciplined Klesch for his sexual harassment of Tardiff. And instead of doing anything, Mr. Berryman did absolutely nothing. There's no record that he took any action. And this is this employee's third sexual misconduct, third act of sexual misconduct at Office Depot. And the person who's not taking the action is the person who Mr. Klesch understood it was the norm to engage in sexual banter with because he did it during his management training. So you're counting three being viewing pornography, Tardiff, and then this is the third one. That's correct, Your Honor, and those are all documented. The first two are in his personnel file. The third is the testimony of a Home Depot management employee who says, and I think it's important, Klesch testified after the second incident he was surprised he was not discharged. That's his own testimony at ER 101. This manager reports him, Berryman does nothing. This manager is then asked, was she surprised that Klesch began to prey on my two clients? And she testified, no, I was not surprised at all based on the conduct I observed. So that's ER 127. So I'm trying to, you're talking about Workman, and what was the date? Because this now is talking about Tardiff again. Yes, Your Honor. The date, and I don't believe there's a date specified in the record, but it's clear that it's after the Tardiff incident. Because she's saying, did any employees ever complain to you about Mr. Klesch making inappropriate comments in the workplace? Yes. How many? One. And what was your name? I believe it was Cynthia Tardiff. So it seems to be at the same time that the Tardiff incident was going on. And I'm really trying to understand whether there were things that were two years later, three years later, four years later. Well, and I think the time frame is not specified, Your Honor. But we do have, and it continues, it's on 125. She discusses the fact that it made her feel uncomfortable, the workplace comments Mr. Klesch was making. This is on 125. On 126, this Home, this Office Depot management employee is testifying, did Mr. Klesch's comments make you feel uncomfortable? Yes. But it's all related to this Tardiff incident, or at least it seems to be around the same time they were at the same store and these were the complaints that they were getting. Well, it's certainly not clear on the record that, you know, I believe it's a separate incident. I think the record's a little muddled. But regardless, you have management employee reporting this. Well, look, it's your burden to show us that the first discipline didn't work, so they should have fired him the second time. But if we can't tell whether it's before or after the first discipline because the record is muddled, then that's not shown. Well, it's not our burden, Your Honor. This is the Ferragarellis defense where it's Office Depot's burden to prove that no reasonable juror, no one could possibly look at the record and say Office Depot. Right. The affirmative defense is their burden. Right. And to say that Office Depot took reasonable care to prevent sexual harassment. And the best evidence that they didn't take reasonable care to prevent sexual harassment is multiple reports of sexual misconduct that are fostered in a bawdry, sexually charged environment created by management employees. They don't discharge Mr. Klesch despite multiple reports of sexual misconduct. And despite him saying, I was surprised they didn't fire me based on what I did, he begins to sexually harass two other employees in the exact same way. Is there anything in the record that shows that their discipline and warning to fire if this ever happens again came before or after this workman incident? Your Honor, the first one saying to fire him with any future incidents was for viewing pornographic videos at work. Then we had the Tardoff incident that was in his folder and they didn't discharge him. They violated their own policies by not doing so because he was on a last notice for sexual misconduct. And that's why we have this situation here where he begins to court sexual favors and ask my clients to have sex with him in return for getting more hours at work. Because Office Depot didn't do the right thing. It was clear that they had a sexual deviant on their hands. They kept him in a store. He preyed on more women resulting in four separate women resigning their positions, ruining their careers at Office Depot because Office Depot did not do the right thing in this case, even though his own personnel file reflected the fact that they should have discharged him if he had done exactly what he was accused of doing to Mrs. Tardoff. Thank you, counsel. Counsel. Thank you, Your Honor. May it please the Court. My name is Rich Manighello representing Office Depot. This case is exactly the case that the Supreme Court had in mind when it decided the Farragher-Miller cases in 1998. When it decided what? I'm sorry? I couldn't hear you. Oh, I'm sorry, Your Honor. This is exactly the kind of case that the Supreme Court had in mind when it decided the Farragher-Miller cases in 1998 and set out the affirmative defenses. Let me address the point that counsel spent most of his time on regarding the prior activities of Mr. Klesch. The record is unclear about whether the vague, unsubstantiated reports or report from Ms. Workman occurred before or after the final performance improvement plan. But what we do know is it happened at least four years ago or four years before the harassment took place because that's the point in time at which the individual stopped working together. That's the closest we know. So what establishes that time element in the record? In the record, Your Honor, it is noted, and I'm finding the factual citation for that. I'm not sure if in the record there is a clear indication of that I could directly point you to besides the fact that we know that Ms. Workman stopped working or was transferred from the store in 2002. I don't know anything from the briefing. I believe it looks as if it could be at the excerpt of Record 289 regarding Ms. Workman's job history. It provides, yeah, 289 is the declaration of Kelly Workman, which will demonstrate that she, during the time frames that she was an assistant manager, and therefore noted that she transferred in 2002 to another Office Depot location, and at that point then we know that she no longer worked with Mr. Klesch. So we have Ms. Workman's declaration at Excerpt 289. It's very important to recognize that the harassment awaited in 2002? Correct. Correct. At the very latest. At the very latest. And the Workman testimony was that she heard some inappropriate comments about female employees, reported the behavior to Mr. Berryman. Mr. Berryman said he doesn't he does not recall receiving any such complaints. And because there's no written report or any investigation requested, there's no documented evidence of that. So are you saying it's not enough to create a genuine issue of material fact as to whether Office Depot took appropriate steps? Oh, absolutely, Your Honor. I don't believe that that evidence in and of itself, even combined with the other allegations, would create any material fact that Office Depot did not take its obligation seriously to rid the environment of sexual harassment and to keep it a professional working environment. When you look at the totality of the circumstances, the fact that it did happen five years before, they provided him a final warning that they followed through with once they learned of something years later. He did go through training. ER 104 notes that he admits he went through a training. It was a general human resource training that included sexual harassment as one of the many things that he was trained on. Mr. Manigault, let me get your view on the chronology. Okay. When was the porno incident? That was 2001, June 2001. All right. Then Tardoff? August 2001. And then the workman complaint was sometime before 2002? Correct. Before or during? We don't know. Well. We just know it had to have happened between 2001 and 2002. And so what's certain is that the — Pardon me. I hadn't finished yet. Okay. You're saying that he undertook — he underwent some special training on sexual — No. I apologize for being unclear. The facts in the record indicate that when he was first hired as a manager, he went through general training. So after these three incidents, he got no special training? He did receive a performance improvement plan that indicated if further harassment took place, he'd be terminated. So he got a final warning, but no training? Correct. And so then from 2002, there were apparently no incidents reported until the plaintiff's case? Correct. And what was the earliest incident? Well, the earliest that they received a phone call — the earliest incident was in March — sometime between March 2006, April 2006. And when was the complaint? April 15th of 2006. And it's — I'm sorry, April 14th of 2006 is when, on the same day, one manager made a complaint and they received an anonymous phone call from another employee. And when was the improvement plan and warning? August 2001. August 9th, 2001. So we know that if we walk through each of the obligations of Office Depot individually to sustain the Farger-Ellerth affirmative defense, that by exercising reasonable care, besides the fact that there's no question that they had a strong policy in place and, in fact, went above what the Ninth Circuit requires in the Nichols v. Azteca case, the Kohler case and the Holly D. case, by also having an anonymous hotline that both plaintiffs acknowledge knowing about and know that they could use it at any time to report harassment. So certainly, they fulfill that obligation. Regarding Mr. Clash, one other piece of evidence I think is important to note in the record, in his 2002 review, it's noted specifically that his supervisor indicated, quote, Your judgment this year has been much improved. There have not been any instances of the poor judgment that haunted you last year. There's certainly evidence in the record, then, that Office Depot took its obligation seriously by continuing to closely examine Mr. Clash's behavior to ensure that it did not happen again. I suspect that if this Court were to accept my opposing counsel's view that Office Depot should have immediately fired this individual upon hearing these initial reactions, you would turn Title VII into a one-strike-and-you're-out policy or a one-strike-and-you're-out statute. And what's clear is, under Faragher and Ehlers, that there is room for people to improve. And, in fact, if Mr. Clash had not gone down this road again, he was having a fine career at Office Depot and could have continued. But because he once again took inappropriate conduct that violated the company's policies, they eradicated it quickly. It's very important to note that neither Ms. Mott nor Ms. Brackett ever made the complaint about Mr. Clash. In fact, Ms. Brackett never even participated in the investigation when she learned it was ongoing. But when the investigation did occur right away, started the next day, it involved meetings with several associates, a long two-hour meeting with Ms. Mott, two written summaries from her to get the full story. And then it also involved Mr. Clash being interviewed, investigated, and even though he denied wrongdoing, they immediately placed him on administrative leave so that he could not do this to any other associates. He was already in another store, so they didn't have to worry about separating him from Ms. Mott. And at the conclusion of the investigation, they terminated his employment. And I think it's very important to note that Mr. Clash denied any wrongdoing at that investigation. And we could be sitting here saying it was a he said, she said, allegation could be interpreted differently, and the company in its own judgment decided to retain him and yet perhaps still be making a Farger-Ellerth argument. But yet the company took its obligation seriously, recognized that he had a prior performance improvement plan that noted he would be terminated if it were to occur again, and then followed through with that. It's also there's certainly no question that. Kennedy. Well, you say it converts Title VII into one strike and you're out. As I've taken notes on this, you're arguing for three strikes and you're still in. Well, Your Honor, I think it's important to note that viewing the pornographic material at work, the reason that in the record it's noted, the reason he received solely a warning because of that was it was for inappropriate use of the company intranet. There were, it wasn't a situation where he was alleged to have been harassing other associates. The only. Within view of women who worked at the company? Not that's in the record, Your Honor. The other, it's important to also note that regarding the Tardif complaint, one of the reasons why Mr. Clash was not fired at that time is because he noted that Mr. Tardif, who was a mutual banter back and forth, and this is in the record at ER 295, he refuted the allegations and showed phone records to the employer that showed that actually Ms. Tardif initiated the majority of phone calls to him. And so his excuse was this was a mutual banter back and forth. And so on these occasions, it's reasonable for the company not to have necessarily immediately fired this individual and considered these blatant, obvious instances of a known sexual predator, let's say, in the workplace. Oh, so Tardif was calling him? That's what the record indicates, or at least that's what he stated to them, and that's why, that's one of the reasons why the company only provided a warning as opposed to a termination at that time. There's no doubt in the record that the two plaintiffs had reasonably failed to avail themselves of the comprehensive reporting procedure that the company had in place, including the anonymous hotline. This case falls right in line with the Hartage and Montero and Kohler and Holley D cases that are cited in our brief at pages 24 and 25. And I think even though counsel didn't have time to address these, I know one of the other issues that's noted in his brief is he's – plaintiffs allege that there was a tangible employment action which would eradicate the possibility of a Farger Ellis offense. And it's very important to note that there was no tangible employment action that resulted from the actual harassment. The Nichols v. Azteca case that this Court has decided – It's really all a question of retaliation, I think. I think the theory is everybody thought, even though it wasn't true, but everyone thought that Mott was responsible for getting Klesch fired. So her hours were reduced in retaliation. I think that was the theory. That could be one of the theories, Your Honor, and I'm certain that the record does not back up those allegations, though. It's very true. Well, the record shows – I believe it's most – best summarized in footnote 4 of the district court's opinion, which is at the excerpt of record 13, where he pulls a sampling from the various hours reports of the other individuals that the plaintiff claims would be comparators to her. And not only does he note the fact that some of the numbers that we're looking at could be along the lines of – like, for example, there's an individual named Dustin that she alleges was somebody else who received better hours. One week in the time period in question, Dustin had 30 hours, Ms. Mott had 31, as did Ms. Brackett. The next week, Dustin had 15, Ms. Mott had 9.5, and Ms. Brackett had 18. The district court also demonstrates – also shows that, in fact, in one of the weeks, Dustin had only 26.5 hours, whereas Ms. Mott had 34.5, and Ms. Brackett had 32.5. So I believe the district court has looked at it very thoroughly, and that's one of the best summaries to demonstrate that there is no evidence that the hours were reduced. In fact, to the extent that there's a disparate treatment angle – and I know that's the third assignment of error as an allegation of perhaps gender disparate treatment – in those cases, there were only five – excuse me – only five cashiers who were similarly situated, and only two others had hours reduced more than Ms. Mott. So it's difficult to prove in the record, from the plaintiff's perspective, that those – that that could be a tangible employment action. And certainly to the extent that Ms. Mott claims that the ultimate – her ultimate job abandonment or termination or constructive discharge that occurred four months later, that certainly is not connected in any way to the harassment. And under Nichols v. Azteca, it was separate enough that it wouldn't be a tangible employment action that would destroy our opportunity to employ the Farger and Ellers defense. The whole concept that the Supreme Court put forth in saying that tangible employment actions would destroy our opportunity to do so is a recognition that if a manager's actions are beyond the pale that it resulted in a tangible employment action, even if the employee did not report that, the employer shouldn't be allowed to get away with that, but with an affirmative defense. And that's not the – that's not the situation here. I see that my time is about up. If there are any additional questions. Thank you, counsel. Mott and Brackett v. Office Depot is submitted.
judges: Kleinfeld, Bea, Ikuta